IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>vs. )<br><br>James Benjamin Gosnell, Jr. )<br><br>  ) | Case No. 2:25-mj-00068 |

**THE UNITED STATES' BRIEF IN SUPPORT OF MOTION FOR DETENTION**

The United States of America, by and through BRYAN P. STIRLING, United States Attorney, and Assistant United States Attorney Katherine Orville, hereby files this brief in support of the Government's Motion for Detention of the Defendant, James Benjamin Gosnell, Jr. ("Gosnell" or "Defendant"). Gosnell should be detained pending trial because he poses both a grave danger to the community, particularly children, and a risk of nonappearance at future proceedings.

**PROCEDURAL BACKGROUND**

On September 16, 2025, Agents with the Department of Homeland Security Investigations ("HSI") executed a federal search warrant at Gosnell's residence, during which time Gosnell confessed to possessing Child Sexual Abuse Material[1] ("CSAM"). On that same date, a Complaint was signed charging Gosnell with Possession of Child Pornography, in violation of 18 U.S.C. § 2522A, and he was arrested.

---

[1] For the purposes of this Memorandum, the term Child Sexual Abuse Material, or "CSAM," will be used interchangeably with the statutory term: "Child Pornography." Any time the term "CSAM" appears, the Government is indicating that such material meets the statutory definition of "Child Pornography." The Government, like the Fourth Circuit, has elected to refer to this "content as 'child sexual abuse material' to reflect more accurately the abusive and exploitative nature of child pornography." *United States v. Kuehner*, 126 F.4th 319, 322 (4th Cir.), *cert denied*, 145 S. Ct. 2762 (2025).

1

On September 17, 2025, Gosnell appeared in federal court for his initial appearance on the Complaint. During that hearing, the Government moved for detention, and the Court scheduled a hearing for Monday, September 22, 2025.

## FACTUAL BACKGROUND

On DATE, HSI was made aware of a National Center for Missing and Exploited Children ("NCMEC") CyberTip issued in December 2024. The CyberTip flagged numerous accounts on PayPal that were communicating with and making payments to a known CSAM vendor from the United Kingdom. Investigators identified numerous accountholders that paid the CSAM vendor, confirmed that those accounts were used to purchase CSAM, and learned that the vendor distributed CSAM through Telegram.[2]

### Identification of James Gosnell

Investigators determined that one of the PayPal accounts that paid the CSAM vendor belonged to Gosnell. The CyberTip identified PayPal account ending in 9731 as having sent two payments to the CSAM vendor on November 4, 2024, with the transaction note "vid." Further investigation revealed that the PayPal account ending in 9731 was created on that same day: November 4, 2024, and that it conducted no other transactions. Federal agents found correspondence from the CSAM vendor via PayPal on November 5, 2024 regarding refund processing. On December 20, 2024, the account placed a hold on both transactions, reporting that it was unauthorized.[3]

---

[2] Telegram is a cloud-based messaging app that allows users to encrypted send text messages, voice messages, photos, videos, and files.

[3] It is understood that individuals who purchase CSAM online often are purchasing login credentials to a file sharing site. As a result, CSAM vendors have little recourse in instances where the CSAM buyer reports the transaction as fraudulent, even if the exchange of the login information actually occurred. It has also been reported that collectors of CSAM sometimes reverse payments made to CSAM vendors if the product the collector receives is unsatisfactory.

Federal agents were able to determine that the PayPal account ending in 9731 listed a primary street address of ███████████ Charleston, SC 29407, the email address ███████@aol.com, and the phone number 1 843███████ all of which were found to belong to James Gosnell. The account was created, and transactions conducted, from IP address 45.22.6.151. The investigation revealed that IP address resolved back to the net range of AT&T, with subscriber information that the account was associated with James Gosnell, with a service and billing address of ███████████ Charleston, SC 29407, the email address ███████@aol.com, and the phone number 843███████.

An additional PayPal account belonging to Gosnell was subsequently located. This PayPal account, ending in 4954, was also used to conduct transactions on November 4, 2024. This account sent three payments to the CSAM vendor with the subject "Games." All three of the transactions had the status "Denied_Cancelled."[4]

Federal agents were able to determine that the PayPal account ending in 4954 was created on October 11, 2021. It listed a primary street address of ███████████, Charleston, SC 29407, the email address ███████@aol.com, and no phone number, all of which were found to belong to James Gosnell. The account is sourced from the same credit/debit card number as the Gosnell PayPal account ending in 9731.

Execution of Federal Search Warrant for Residence and Electronics

On September 16, 2025, HSI executed a federal search warrant at James Gosnell's residence. When federal agents arrived on scene, Gosnell met them at the door and asked whether they "knew who he was." When they had explained the scope of the search warrant, Gosnell told

---

[4] Transactions can be denied for a variety of reasons, including but not limited to, because the source financial institution declines a transaction, an account is limited while under a review by PayPal, or because details have not been confirmed.

federal agents he'd "show [them] what [they're] looking for" and led them to a USB flash drive plugged into his computer. He later told federal agents it would contain hundreds of videos of CSAM, which it did. In addition to the USB flash drive, federal agents seized 13 additional flash drives, an iPhone, and numerous other electronic devices, discs, and VHS tapes, as well as a myriad of records.

In a post-*Miranda* interview, Gosnell confessed to possessing CSAM, attempting to purchase CSAM, and communicating with "like-minded individuals" on Telegram. Gosnell admitted that he had possessed CSAM and viewed it. He told federal agents the flash drive he had led them to would contain hundreds of videos of CSAM, and when asked whether it was very young children, such as "little babies," he replied that it contained "everything." He told federal agents he had attempted to purchase CSAM using PayPal one time, unsuccessfully.[5] He admitted to having conversations with CSAM vendors about the purchase of CSAM. He admitted to having conversations with other pedophiles, though he claimed he had not received CSAM files "for years" and does not know anyone who would possess CSAM.[6]

Gosnell also claimed his PayPal account and US Bank card were hacked during his attempts to purchase CSAM. He claimed that he had tried, and failed, to obtain CSAM from an individual, and that individual had "hacked" his PayPal account his US Bank card information had been stolen, resulting in fraudulent charges in the UK and the Netherlands, which he reported to his bank as fraudulent.[7]

---

[5] In contrast, PayPal records from both accounts ending in 9731 and 4954, in conjunction with Gosnell's IP address records, all indicate at least five transactions with the CSAM vendor.

[6] Evidence located during the initial forensic review of Gosnell's iPhone indicates he received CSAM as recently as late summer 2025. Extensive evidence from Gosnell's iPhone, discussed in greater detail below, indicates Gosnell spoke frequently with other pedophiles, all of whom are likely to possess CSAM, and in at least one case Gosnell traded CSAM with another pedophile.

[7] The Government anticipates Gosnell arguing he was the victim of a hack. This is a red herring. Records show that Gosnell's PayPal accounts ending in 9731 and 4954 have an associated credit card from Citi Bank- a Costco branded card, not a US Bank card. All transactions resolved back to Gosnell's IP address at his residence in Charleston, South

Execution of Federal Search Warrant at Gosnell's Chambers

On September 17, 2025, federal agents executed a federal search warrant at Gosnell's chambers at the Charleston County Magistrate Court. Among the seized items were bank records for a US Bank account and a Citi bank account. The US Bank account statements reflect several charges from the UK.[8] The Citi bank account statements had highlighted the two PayPal transactions made to the CSAM vendor.

Forensic Examination of Electronic Devices

Forensic examination of the seized electronic devices is ongoing. However, the devices that have been processed thus far have been revealing.

The USB drive shown to federal agents by Gosnell, which was found plugged into his laptop computer and which he claimed would contain hundreds of videos of child pornography has been preliminarily analyzed. As anticipated, it contains hundreds of files of CSAM. Three particular files contained USB Flash Drive titled "dropper" are described as:

    a.    Image "y (22).jpg": This file was last written April 24, 2018, and was last accessed August 12, 2025. This image depicts the vaginal penetration of an infant less than one year old by an explicitly phallic device. A pacifier is visible in the infant's mouth. There appear to be ropes tied around the infant's wrist and ankles.

    b.    Image "HAEO3124.jpg": This file was last written June 4, 2018, and was last accessed September 6, 2025. This image depicts a male less than three years

---

Carolina. Any alleged hack is irrelevant to this Court's determination of probable cause and detention. The Complaint charges Possession of Child Pornography, and child pornography was, in fact, found in Gosnell's residence and Gosnell claimed ownership.

[8] As discussed in footnote 3, the origin or purpose of these charges is unknown at this time, and this account is not associated with Gosnell's PayPal accounts ending in 9731 and 4954.

old with his legs tied to a protruding piece of furniture in a manner to further expose the anus and genitals. The anus and genitals are the focal point of the photo.

    c.    Image "bl (684).jpg": This file was last written April 24, 2018, and was last accessed September 10, 2025. This image depicts a prepubescent male performing oral sex on an adult male's erect penis.

Federal agents have also begun to analyze Gosnell's iPhone. Federal agents located Telegram on Gosnell's iPhone, which was logged into Gosnell's account. Based on their review of his iPhone, federal agents determined that Gosnell communicated with a Telegram user known through the investigation to be the CSAM vendor to whom he had sent PayPal payments.

Additionally, Gosnell communicated with another adult man with a shared interest in pedophilia. It appears from the unimaginably explicit conversations that Gosnell was romantically involved with the other individual, but that their romantic interests involved abusing children together. Exhibit B. In one of these conversations, Gosnell and the other pedophile are planning a trip for Gosnell to visit him in Florida. The purpose of this visit is for the other pedophile and Gosnell to jointly rape and torture the other pedophile's nephew's infant son. After discussing in great detail the ways they would each like to rape the infant, the conversation takes an even more evil turn. The other pedophile tells Gosnell, "Watch you snuff my nephew's son. Tie him up by his legs. Torture him. I want to see you do that baby." Gosnell's reply is "I picked to [sic] the back of the head scramble his brains he stays alive for a few hours, but for the most part is brain dead." *Id*.

Their conversations also reveal that they considered USB flash drives to be a preferred method of storing their CSAM collections. It appears from their conversations that once Gosnell

traveled to Florida to meet this individual and gave him a USB flash drive. Some time later, the individual mailed the USB flash drive back to Gosnell in Charleston.

Alarmingly, Gosnell's conversations on Telegram also reveal numerous instances in which he raped and abused children. Exhibit A. In a conversation in which Gosnell was getting to know another pedophile, he asks, "how twisted u into?" to which the other pedophile replies "very very twisted. No limits basically." Gosnell's response was "FUCK yes NONE here." The other pedophile responds, "rape torture etc." Gosnell then proclaimed, "a screaming kid makes me more than evil and my cock rock hard." *Id*.

In one conversation, Gosnell details his sexual abuse of a 3 month old. *Id*. Gosnell says he was "keeping it for neighbors who sitter stood them up." He tells the other pedophile how he "ate is pussy an ass…came 7 times…looked like a glazed doughnut." The other pedophile asks whether they baby cried when he did it, and Gosnell says no. *Id*.

Gosnell also describes how he abused a 5 month old in public in his neighborhood. *Id*. He tells the pedophile that he "held one of the neighbor kids the other day. The kid is like five months old and I'm sitting there and holding it and I'm in the middle of the street little blankets over and I slipped my finger into its pussy and rubbed its[9] pussy." *Id*.

Later in the conversation Gosnell sent a selfie he took of himself and a 2 year old child with the message "my new buddy." *Id*. He claimed to have sexually assaulted the girl 2 weeks prior. He later sent another photograph of himself and a baby he says was 2 weeks old, admitting to having orally assaulted the baby. *Id*.

---

[9] It is worth noting that in almost all descriptions of his abuse, Gosnell refers to children as "it," rather than "he" or "she." This dehumanization of the children he rapes and abuses is further evidence of the deep entrenchment of his depravity.

7

In these Telegram conversations, Gosnell describes traveling to Puerto Vallerta to have sex with a 2 and 5 year old. *Id.*. He says their mother was a "meth whore" who was "sold her kid for a few hours" and that he anally raped at least the 2 year old boy. *Id.* Additional conversations suggest other international travel for the purpose of engaging in sex with children. Federal agents are aware that in late summer 2025, Gosnell traveled alone to Amsterdam.

Federal agents additionally found evidence that Gosnell claimed to be leading "Zoom posts" in which he would teach other pedophiles the tricks of the trade.

The remaining electronic devices to be processed are as follows:

- 4 computers
- 13 USB drives
- 7 SD cards
- 2 iPads
- Miscellaneous Discs and VHS tapes

## ARGUMENT

In determining whether detention is appropriate, the Court must consider the relevant factors enumerated in 18 U.S.C. § 3142(g). To detain Gosnell, it is sufficient that the Court make a finding of either a risk of the defendant's nonappearance or the defendant's danger to the community; the law does not require a finding of both. *United States v. Stewart*, 19 F. App'x. 46, 48 (4th Cir. 2001). When the Court considers all the factors enumerated in 18 U.S.C. § 3142(g), the answer is clear: Gosnell must be detained pending trial. No condition or combination of conditions will be sufficient to ensure Gosnell's reappearance or to ensure the safety of the community.

1. <u>The nature and circumstances of the offense charged</u>

For the purposes of detention pursuant to 18 U.S.C. § 3142, charges under 18 U.S.C. § 2252A are considered to be both crimes of violence and crimes involving minors. *See* 18 U.S.C. § 3156(a)(4)(C) (defining "crime of violence" to include any felony under chapter 110 or 117); *see also United States v. Morace*, 594 F.3d 340, 350 (4th Cir. 2010) (observing Congress has made clear its "view that child pornography crimes are serious offenses") (cleaned up) These designations provide the first hint at the seriousness of the offense at hand.

The conduct in this case is of the most reprehensible sort. Not only did Gosnell possess CSAM, but the CSAM that he found sexually arousing "is particularly vile" and depicts the rape of prepubescent minors—- of children, of toddlers, of infants. United States v. Allen, No. 6:12-CR-00002-8, 2012 WL 1833889, at *4 (W.D. Va. May 18, 2012); *see also* United States v. Cameron, No. 1:09-CR-00024-JAW, 2011 WL 890502, at *11 (D. Me. Mar. 11, 2011) ("[T]he images of child pornography that he admits he possessed are not benign. They are vile and reprehensible depictions of adults having sex with very young children, occasionally even babies."). In *Cameron*, the Court mentions that the Defendant possessed files "occasionally even babies." Gosnell specifically sought out infants and toddlers, both in CSAM and to rape and abuse. It was not occasional, but rather his preferred age range. The infant and toddler CSAM found on the USB flash drive was viewed as recently as September 6, 2025. Another image of a prepubescent child was viewed September 10, 2025. Gosnell did not merely receive this CSAM and put it on a shelf. Rather, he continued to access it and enjoy the abuse of children. His continued compulsion to view these images remains undeterred.

Gosnell's conduct also incentivized the production and distribution of more CSAM. The evidence shows that Gosnell shared his interests with others by communicating with other pedophiles and sending money in an attempt to obtain more CSAM. In doing so, Gosnell became

9

an inextricable spoke in the wheel of the CSAM industry. This is an industry that exists solely because people like Gosnell enjoy the inhumane rape of children and continue to fund its production and expansion. *See e.g.*, United States v. Galvan, No. 3:20-CR-00019, 2020 WL 4604502, at *5 (S.D. Tex. Aug. 11, 2020) (collecting cases to explain that "possessors of child pornography aid in creating and sustaining a market for such material"); *see also United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005) ("[P]rohibiting the possession and viewing of child pornography will . . . help[ ] to protect the victims of child pornography and to *eliminate the market* for the exploitative use of children.") (emphasis in original).

Possession of CSAM is an incredibly serious offense and should be treated as such. It targets and perpetually harms the most vulnerable among us given that "[c]hildren captured in images and videos depicting their sexual abuse 'are harmed initially during the production of images, and the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' who 'live with persistent concern over who has seen images of their sexual abuse" and how those images are being used to cause additional harm.'" *United States v. Garner*, No. CR 24-533 (RC), 2025 WL 1575848, at *3 (D.D.C. Mar. 11, 2025) (quoting Federal Child Pornography Offenses, U.S. Sent'g Comm'n, Dec. 2012 at vii); *see also United States v. Galarza*, No. 18-mj-146, 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) ("Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms."). Possession of CSAM is an incredibly serious offense and should be treated as such. It targets and perpetually harms the most vulnerable among us, and the individual who would choose to view and enjoy it is irrevocably changed from the moment he makes that choice. Thus, the nature and circumstances of Gosnell's crimes undoubtedly warrant detention.

While the complaint charges Possession of Child Pornography, further investigation has revealed numerous other crimes, to include the federal crimes of Receipt of Child Pornography, Distribution of Child Pornography, and Transportation for Criminal Sexual Activity; and to include the state crimes of Criminal Sexual Conduct with a Minor, 1st Degree. These are generally viewed as more severe crimes, which warrant more severe punishment.

2. <u>The weight of the evidence against the defendant</u>

The weight of the evidence against Gosnell is immense, overwhelming, and conclusive. It is not mere suspicion that Gosnell possessed CSAM, it is *an undisputed fact*. Gosnell himself admitted to possessing CSAM and led federal agents to a USB drive containing what he himself described as hundreds of videos of "child porn." *See United States v. Stram*, No. CR. 07-CR-050-01-PB, 2007 WL 529668, at *1 (D.N.H. Feb. 12, 2007) (ordering detention and noting that "the weight of the evidence is overwhelming. Thousands of children's porn photos are on his computer").

Gosnell also admitted he tried to buy additional CSAM in the past, and that he had spoken with various other pedophiles over the years. federal agents identified the PayPal transactions to a known CSAM vendor, confirmed the accounts belonged to him, and verified that the transactions were made from his residence in Charleston, South Carolina. Federal agents reviewed exchanges with the known CSAM vendor on Telegram, during which Gosnell discussed purchasing CSAM. Federal agents forensically reviewed, and are still reviewing, electronic devices seized from Gosnell's residence, finding a trove of CSAM material. Federal agents confirmed that those CSAM files were viewed as recently as days before Gosnell was arrested. Federal agents reviewed conversations between Gosnell and a fellow pedophile in which they discussed their shared desire to abuse children, and that they had "no limits" to the depravity they found sexually gratifying.

They discussed a prior meetup in which Gosnell distributed CSAM to the other pedophile. The conversations detailed the children, frequently from his neighborhood, that Gosnell had raped and abused, and formed plans for Gosnell to travel to Florida in November to rape and potentially murder a very young child. All of this was done while he served as a judge for Charleston County. The weight of the evidence is overwhelming.

3. <u>The history and characteristics of the defendant</u>

Gosnell is a Charleston County magistrate judge. He was appointed to a position of trust and charged with protecting the community from the dangerous criminals among us. Instead, he became a part of an industry that relishes abusing children. His purchases fueled the continued production and distribution of CSAM and his continued viewership cemented his predilections. Again, Gosnell is a man who finds sexual gratification in the rape of a child, the rape of a toddler, the rape of an infant. Moreover, his communications with other pedophiles show that his sexual appetite for this reprehensible type of CSAM is insatiable.

Gosnell's position of trust as a magistrate judge weighs against him because his long-time role in the criminal justice system puts him in a unique position that only increases the likelihood of his danger to the community and his risk of nonappearance if not detained. Gosnell has immense insight into the workings of law enforcement and the court system, which makes him well situated to avoid detection if he were to further offend or to flee. *See United States v. Schenberger*, 498 F.Supp.2d 738, 744 (D.N.J. 2007) ("[A]s to the defendant's risk of flight, the court is not confident defendant will appear in the future given his knowledge of police practices and procedures and his computer expertise. It is not far-fetched to believe that this knowledge will enable defendant to avoid detection if he flees . . . Furthermore, defendant faces a certain substantial prison sentence and the loss of any stature or prestige he held in his community. In addition, as a former police

officer defendant is aware of the risks he faces in prison to his personal safety. This combination of factors creates a substantial incentive for defendant to flee.")

Gosnell's history and characteristics prove that he cannot be deterred. He descended into the mire of pedophilia and CSAM while sitting on the bench. As a judge, he was intimately involved in the administration of justice—including individuals charged with child sex crimes. He knew the legal consequences if he was caught. He knew the reputational and community harm that would result. He knew the harm that comes to the children victimized in the CSAM industry. And yet he still persisted. If being given the immense responsibility of ensuring the safety of his community and holding a position of prestige did not deter Gosnell, it is hard to imagine what might. In *Schenberger*, the court had to consider the issue of pretrial detention for a police officer who viewed CSAM. That court lamented that the officer had "betrayed his oath of office and the trust placed in him by his family, employer and the community at large" and found that "[i]f defendant betrayed this trust, no assurances can be given that he would not also violate any condition of release this Court imposed, no matter how stringent." 498 F. Supp. 2d at 744.

4. <u>The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release</u>

Most importantly, Gosnell should not be released because he is a danger to the community. Under this prong, danger to the community "to "be given a broader construction than merely danger of harm involving physical violence." <u>United States v. Williams</u>, 753 F.2d 329, 335 (4th Cir. 1985) (cleaned up). Community safety refers more broadly to the risk that the defendant might commit any criminal activity which would harm the community.

It is indisputable that, should he be released, Gosnell would pose a danger to the community at large given the risk that he will resume his criminal conduct. Afterall, the mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the

13

community and presents a clear and present danger to all children." Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, 110 Stat. at 3009–27 (codified at 18 U.S.C. § 2551). Indeed, as Congress has observed, "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." *Id.*[10] There is a clear danger to the community shown here by Gosnell's possession and distribution of CSAM. The volume of the CSAM located, the nature of the abuse depicted, and the recency in which Gosnell viewed some of the CSAM files should "give the court pause as to whether any conditions could be imposed which could assure that [Gosnell] would not continue this behavior on release." United States v. Berg, No. 22-10088-JWB, 2022 WL 17403167, at *4 (D. Kan. Dec. 2, 2022)

Crucially—in Gosnell's own words—he did more than possess CSAM. As outlined above, he told another pedophile in great details about his prior rape and abuse of infants, toddlers, and children. Several of these children were his neighbors. He abused at least one of these children in public, surrounded by other people. This raises insurmountable concerns about the safety of the community if he were to be released.[11] Gosnell lives in a residential community and is bound to

---

[10] *See also New York v. Ferber*, 458 U.S. 747, 760 n.10 (1982) (discussing the long-term psychological, emotional, and mental difficulties of children who have been sexually exploited: "[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . .It is the fear of exposure and the tension of keeping the act a secret that seem to have the most profound emotional repercussions.") (cleaned up).

[11] *Allen* is instructive when evaluating this statement. There, as here, the defendant was charged with trading a large amount of child pornography depicting the serial abuse of infants and toddlers. *Allen*, 2012 WL 1833889, at *1. Similarly, the defendant was over 60 years old, a longtime resident in the community, and employed in his profession for thirty years with no criminal history. *Id.* at *5. In one of his chats, the defendant insinuated to another pedophile he intended to commit a hands-on offense when he baby sat his sisters kids. *Id.* In evaluating this statement, the court explained that, even if it was not true, it did "not vitiate the significance of the inference that can easily be drawn from this statement—namely, that within the past year, Defendant may have been contemplating the commission of a hands-on offense (or, at the very least, fantasizing about doing so)." *Id.* Accordingly, the court found that "[t]he burden rests with Defendant to explain this statement, and the Court may not disregard it merely because he does not have a sister." *Id.* So too here. The burden is on Gosnell to explain this statement to the Court. And until, "[s]atisfactory answers"

14

have contact with minors, as demonstrated by the fact he has already abused more than one he met through his neighborhood. It is undeniable that Gosnell is a predator with a preference for infants and toddlers. In his own words he has described his interest in the torture of these children during abuse. Gosnell was so motivated to rape children that he traveled to Mexico to do it. He was planning to travel to Florida in November to rape, torture, and murder an infant. The result is an individual who is of incredible danger to the community in which he resides. *See United States v. Conover*, No. 12-2080 JS, 2012 WL 4846132 at *5 (D.N.J. Oct. 10, 2012). ("The Court does not have to wait for direct proof that defendant molested a minor before it finds defendant is a danger to the community."); United States v. Crisman, No. CR 11-2281 JB, 2011 WL 5822731, at *21 (D.N.M. Nov. 15, 2011) ("While the Court is cautious about detaining "lookers" and people who merely fantasize, the Court is also not obligated to close its eyes and to not detain someone until it has evidence that the defendant has touched someone.").

    Gosnell lives alone in his home with no accountability. If released, he would have the ability to procure additional devices and have unfettered access to the internet and to his fellow pedophiles. Not only would such contact serve to deepen Gosnell's predilections, but it would also allow him to alert others to the investigative techniques law enforcement has used in his case, endangering not only the Charleston community but also communities at large. The Government also remains concerned about the ubiquity of internet access and finds it difficult to imagine a sufficient set of conditions to ensure that Gosnell, an individual well-versed in the practices of law enforcement and the court system, could not obtain unmonitored devices with internet access if he so desired. *See United States v. Risley,* No. 1:17CR147, 2017 WL 2365240, at *4 (M.D.N.C. May 31, 2017) ("While no evidence was introduced of past criminal convictions, evidence was

---

are provided, the Court cannot "be convinced by a preponderance of the evidence that Defendant would not represent a danger to the community." *Id*.

introduced that the defendant's conduct was not an isolated event . . .He is capable of engaging in the same or similar conduct from nearly any internet-enabled device and it would be nearly impossible to prevent [his] unmonitored access to such outlets in an age of ubiquitous internet access and inexpensive computing technology") (cleaned up); *United States v. Hurwitz*, No. CR 116-078, 2016 WL 5952744, at *3 (S.D. Ga. Oct. 13, 2016) ("Even if the Court were to order home detention and electronic monitoring, Defendant would still have the ability to access phones or computers which could be used for the types of illicit activities described above. Indeed, Defendant could obtain a mobile electronic device capable of unmonitored internet access at a corner convenience store. As such, there are no conditions which can reasonably assure the safety of the community and others under the particular circumstances of this case if Defendant is released.").

Gosnell is in possession of several firearms, which he was unwilling to surrender at the time of the execution of the search warrant at his residence. These firearms pose a risk to the community, but they also pose a risk to Gosnell himself. There is immense shame and loss of community standing that comes with the instant charge in addition to the potential for a lengthy prison sentence in his future. While the Court cannot necessarily consider Gosnell a danger to the community simply because he is a danger to himself, the Court can consider the potential that Gosnell may harm himself when weighing the certainty of his appearance at future court hearings.

The Court should be wary of any effort by Gosnell to downplay the danger he poses to the community. Increasingly, the rhetoric by defendants in CSAM cases seems to downplay the real harm caused by the possession of CSAM, and the industry at large. But the Courts have continued to see the immense harm created by the industry, even if possession alone. *See Galvan*, 2020 WL 4604502, at *6 ("[A]ttempting to downplay the severity of the charges by arguing that no victims

were physically harmed as a result of a defendant's 'mere' viewing, possessing, or sharing of child pornography is a non-starter."). As the Third Circuit has pointed out in connection with Congress's findings on Section 2251, which the court viewed as closely related to Section 2252A, "Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.'" *United States v. MacEwan*, 445 F.3d 237, 250 (3d Cir. 2006) (citing the Child Pornography Prevention Act of 2006, Pub. L. No. 104–208 § 121, 110 Stat. at 3009, 3009–27 (1996)). And as the Supreme Court has observed, "[c]hild pornography harms and debases the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307 (2008). "Possession alone of child pornography which appears well-established in this case based on the information proffered–presents serious (even if not irremediable) concerns:

> The ease with which a person can access and distribute child pornography from his home—often with no more effort than a few clicks on a computer—may make it easier for perpetrators to delude themselves that their conduct is not deviant or harmful. But technological advances that facilitate child pornography crimes no more mitigate the real harm caused by these crimes than do technological advances making it easier to perpetrate fraud, traffic drugs, or even engage in acts of terrorism—all at a distance from victims—mitigate those crimes."

*United States v. Reingold*, 731 F.3d 204, 216–17 (2d Cir. 2013) ("[W]e cannot view the distribution of child pornography, however accomplished, as anything but a serious crime that threatens real, and frequently violent, harm to vulnerable victims"). Gosnell's own words have given the Court the evidence it needs to see that he is a danger to the community. A man who would discuss and plan to travel to rape, torture, and murder an infant cannot be released into the community. A man who would brag about raping and abusing infants and toddlers, even in public

surrounded by other people cannot be deterred by any condition or combination of conditions. James Gosnell is the foremost danger to this community and must be detained.

## **CONCLUSION**

Based upon the foregoing, Gosnell is a clear danger to the community and his appearance cannot be assured. Thus, Gosnell should be detained pending resolution of his charges.

      Respectfully Submitted,

      BRYAN P. STIRLING
      UNITED STATES ATTORNEY

      By: *s/ Katherine Orville*
         Katherine Orville (Fed Id: 13332)
         Assistant United States Attorney
         151 Meeting Street, Suite 200
         Charleston, SC 29401
         843-266-1628

September 22, 2025
Charleston, South Carolina